[Cite as *In re B.M.*, 2024-Ohio-111.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

In re B.M., M.M.

Court of Appeals Nos. WM-23-008
WM-23-009
WM-23-010
WM-23-011

Trial Court Nos.  AB20203041
AB20203042

**<u>DECISION AND JUDGMENT</u>**

Decided:  January 12, 2024

* * * * *

Katherine J. Zartman, for appellee.

Karin L. Coble, for appellant, A.H.

Tyler Naud Jechura, for appellant, K.M.

* * * * *

**DUHART, J.**

{¶ 1} This is a consolidated appeal from the July 12, 2023 judgment of the

Williams County Court of Common Pleas, Juvenile Division, terminating the parental

rights of appellants, A.H. and K.M., the mother and the father, respectively, of B.M. and M.M. ("the children"), and granting permanent custody of the children to appellee, Williams County Job and Family Services ("the agency"). For the reasons that follow, we affirm the judgment.

{¶ 2} Mother sets forth three assignments of error:

1. The trial court abused its discretion in denying A.H. and K.M.'s joint motion to dismiss based on the passage of time.

2. The trial court committed plain error by not dismissing the case as to [the children] for the GAL's [(Guardian Ad Litem)] failure to perform his duties, to the prejudice of A.H.

3. The trial court's decision to grant permanent custody and finding that it was in the children's best interests was not supported by clear and convincing evidence.

{¶ 3} Father sets forth one assignment of error:

1. The trial court errored [sic] when it granted the motion for permanent custody [sic] because the original complaint had been filed more than two years prior.

## Background

{¶ 4} Mother has four biological children: S.O., born in or about 2008; X.H., born in 2010; M.M., born in November 2018; and B.M., born in April 2020. S.O. and X.H.

2.

were fathered by men other than K.M., and are not involved in this appeal. However, S.O. and X.H. will be mentioned when pertinent and significant to this appeal.

{¶ 5} The agency's involvement with mother, father and the children spanned three years, 2020 through 2023, during which time four cases were filed and numerous court hearings were held. What occurred at these hearings is helpful to understanding the progression of the cases, thus, the relevant events are summarized below.

**2020**

{¶ 6} On April 29, 2020, the agency became involved with the family when mother tested positive for oxycodone ("oxy"), methamphetamine ("meth") and amphetamine ("amphet")[1] at the time of B.M.'s premature birth. Mother denied drug use. In May 2020, mother tested positive for meth, and again denied drug use. Safety plans were established by the agency for the benefit of all four of mother's children.

{¶ 7} On July 13, 2020, complaints were filed which alleged the children were dependent and neglected; father's overdose in December 2019 was mentioned.

{¶ 8} The agency established case plans for mother and father, which were agreeable to the parents. Mother's case plan required her to: maintain housing and employment; complete PRC[2] applications, parenting classes and the Family Intervention

---

[1] Meth is converted by the body into amphet.

[2] PRC paid for visitations, parenting classes and other services. Without a completed application, the parent had to self-pay for the services.

3.

Court program ("FIC"); comply with home visits and drug screens; and undergo substance use and mental health treatment. Father's case plan was the same, but FIC was not included.

{¶ 9} On August 12, 2020, GAL Aaron Cook filed a report concerning the family members. Also on the day, the children were adjudicated neglected and dependent, and the agency was granted protective supervision of the children.

## 2021

### Semi-Annual Review Hearing - January 5, 2021

{¶ 10} Mother attended the hearing and consented to the agency's continued protective supervision of the children. Father did not attend the hearing.

### Annual Review Hearing/GAL Report - July 1, 2021

{¶ 11} GAL Cook filed a report with updates regarding the family.

{¶ 12} Mother attended the hearing via Zoom, father did not attend. In April 2021, mother had a random drug screen and was positive for meth, she failed to show for an appointment at Recovery Services ("Recovery"), and cancelled an appointment. Mother then started inpatient treatment at Serenity Haven ("Serenity"); she was sober and taking parenting classes. Her 68-year-old grandfather, T.V. (the children's great-grandfather), took in all four of mother's children while she was in inpatient treatment. Mother had two visits with the children, but visits stopped due to a verbal altercation and because the children had severe head lice.

4.

{¶ 13} In May and June 2021, father had three random drug screens and tested positive for, respectively: THC; cocaine, meth, amphet and THC; and meth, amphet and THC. The court suspended father's visits with the children due to his failure to comply with the case plan. Protective supervision of the children was continued.

### Show Cause - Father

{¶ 14} On August 12, 2021, the agency filed a show cause motion alleging father failed to follow the court's orders; a hearing on the motion was scheduled for September 8, 2021. However, father emailed the caseworker that he could not attend the hearing because his 20-year-old daughter died and the funeral was in Kentucky on September 8, 2021. The court rescheduled the hearing, and ordered father to provide written verification of his daughter's death and funeral.

{¶ 15} The show cause hearing was for rescheduled September 15, 2021, but father failed to appear and there was no communication with him since his email. The court issued a bench warrant for father; he was arrested.

{¶ 16} On September 22, 2021, a bond hearing was held, with father present, and a $5,000 bond was requested to ensure father's appearance at a future hearing. Father told the court that he lived in a trailer ("the trailer") and "came back up here to help [mother] get her place fixed up. We was working things out, I've been there all year. That's my physical address." Father claimed he had no money for bond, as all of his money was wrapped up in the trailer. The judge ordered $5,000 bond, no 10%.

5.

{¶ 17} On September 28, 2021, the show cause hearing was held, and father admitted he violated the court's orders. The court accepted father's admissions, released him from custody and scheduled a sentencing date.

### Review Hearing - October 21, 2021

{¶ 18} The 15-month review hearing was held; mother was present, father was not, as his attorney indicated that father was working and could not miss work. It was requested that protective custody be extended. Mother claimed she was not in relationship with father and continued to work her case plan, but she had a positive drug screen in September 2021. Father tested positive for THC in early October 2021, and he tested positive for a relatively high level of meth, amphet and THC in mid-October 2021.

{¶ 19} GAL Cook testified and voiced numerous concerns. First, T.V. spent less time with mother's four children, so mother stepped in to help. The two older children were criminally charged for property damage, and school was not great. Next, despite court orders that father have only supervised visits, when he was in jail the video footage revealed that he asked mother to allow him to see the children and she complied. The GAL viewed another video in which mother said to father that the court expected her to break up with him, but she had no intention of doing so; she would just tell the court what it wanted to hear. The GAL questioned how much progress the parents made in the last 15 months, and thought future options should be explored, as the parents seemed intent on deceiving the court and not working the process.

6.

**{¶ 20}** The court temporarily extended protective custody; a full hearing was scheduled to determine whether to continue protective custody beyond the one-year mark.

**GAL Report/Motion to Extend Protective Custody Hearing - November 12, 2021**

**{¶ 21}** GAL Cook filed a report with updates regarding the family members.

**{¶ 22}** Mother and father attended the hearing. Mother completed inpatient treatment at Serenity, outpatient treatment at Recovery and was in aftercare sessions. Overall, she made significant progress in her case plan services, yet she was unemployed, received disability payments, had not secured her own housing and had only T.V. for support.

**{¶ 23}** Father completed an assessment at Recovery and it was initially recommended that he attend individual counseling, submit to random drug screens and go to medication management services. However, due to father's positive drug screens, intensive outpatient group sessions were suggested. Father was drug tested by the agency twice a month, and all screens were positive for illegal drugs. It was reported that between July and October 2021, father refused some drug screens and threatened agency workers, so no meetings were attempted with him due to safety concerns. Father's behavior improved, he was civil and he apologized for his actions.

**{¶ 24}** In late October 2021, father suffered a serious leg injury. He disclosed that he received social security disability insurance ("SSDI") and worked construction on the

7.

side; he did not verify his work. Father lived at the trailer, owned by the trailer park, and paid lot rent and utilities. Since April 2021, he made improvements on the trailer. He slowly worked on his case plan and made some progress.

{¶ 25} The court granted the agency's motion to extend protective supervision.

**Sanction Hearing for Father's Contempt Citation - November 23, 2021**

{¶ 26} Father provided the court with the obituary for his 22-year-old step-daughter, who died in Kentucky on August 20, 2021. Father attended the viewing on or about August 24, 2021, but not the funeral, and he returned to Ohio on September 1, 2021.

{¶ 27} The agency indicated that father was cooperative, signed a release of information and allowed four home visits; the trailer was clean and father claimed that only he will live there. He attended one individual treatment session at Recovery, on November 1, 2021, did not attend two later sessions and failed to participate in intensive group sessions. He claimed he completed a TeleMed mental health assessment in November 2021. Father's two drug tests by Recovery were positive for, respectively: meth, amphet and THC; and meth, amphet, THC, THC3 and hydromorphone (for which father had a prescription), and his two drug screens by the agency, conducted on different dates than Recovery's tests, were both positive for meth, amphet and THC. Father was unable to visit the children due to his leg injury.

8.

**{¶ 28}** The agency recommended, as a sanction for the contempt citation, that father attend the Renewal Center ("Renewal") and complete any recommended treatment; no jail time was recommended if successfully completed Renewal.

**{¶ 29}** The court sentenced father to 30 days in jail, which were suspended if he successfully completed Renewal or any other inpatient rehab and complied with all outpatient orders and recommendations.

### Show Cause - Mother

**{¶ 30}** On December 28, 2021, the agency filed a show cause motion alleging mother failed to follow the court's orders. On December 30, 2021, a motion hearing was held, with mother present. It was reported that on December 8, 2021, mother was drug screened by Recovery and tested positive for Gabapentin, which she was prescribed, but "it came back at a high level," and she was also screened by FIC, and tested positive for meth. On December 10, 2021, she was drug screened by Recovery and tested positive for meth. Mother was drug tested by the agency in November and December 2021, on different days than Recovery and FIC, and all tests were negative.

**{¶ 31}** The positive drug tests were discussed with mother; she did not admit to drug use. Recovery recommended intensive outpatient treatment, while FIC recommended inpatient treatment at Serenity, where she would be admitted on January 4, 2022.

9.

{¶ 32} The court found mother in contempt by violating her case plan when she, inter alia, tested positive for illegal drugs. She was sentenced to 30 days in jail, to be served immediately unless she purged the contempt by completing a refresher course at Serenity.

{¶ 33} The court granted emergency custody of all four of mother's children to the agency. The four children were removed from the home and placed in foster homes.

**2022**

**Motion for Reconsideration and Hearing**

{¶ 34} On January 5, 2022, mother filed a motion for reconsideration of the court's findings that she violated the court's orders by using illegal drugs, not being truthful or cooperative, and continuing to be involved with father, a known drug user.

{¶ 35} On January 10, 2022, a hearing was held and mother presented evidence that on January 3, 2022, she took a hair follicle test and no drugs were detected. She testified, and presented the testimony of the worker who collected her hair sample, sent it out for testing and received the test results. The agency offered the testimony of a forensic toxicologist, who studied the effects of drugs on the body and worked in a laboratory which specialized in detecting drugs in biological fluids.

{¶ 36} The court found the science clearly showed there was meth in mother's drug screen, which was a violation of the court's order. The court found nothing to overturn its previous findings, and denied mother's motion for reconsideration.

10.

**Hearing on Temporary Custody and Motion for Sanctions - January 31, 2022**

{¶ 37} Mother and father were present at the hearing and both consented to the agency's request for temporary custody of the children. Father then asked to be removed from the case plan, which the court permitted; the agency withdrew its motion for sanctions.

{¶ 38} The court granted temporary custody of the children to the agency.

**Review Hearing - March 9, 2022**

{¶ 39} Mother attended the hearing, father did not. It was reported that father wanted to be on back on the case plan again; he was added back. Mother was in inpatient treatment at Serenity, she was compliant and had an expected out-date of April 5, 2022. It was not known where mother would live when released, as the agency conducted a home study of T.V., and while he passed his background check and his home was approved, he had four positive screens for THC so more random drug tests were sought. Mother visited with the children, and there were no concerns. The children did well in their foster home, although M.M. struggled and cried a lot at first due to her attachment issues with mother.

{¶ 40} The court found it was in the children's best interests to remain in their current placement, and for the agency to have temporary custody. Father's 30-day jail sentence was reimposed, but suspended if he successfully completed inpatient drug treatment.

11.

**GAL Reports - June 27, 2022, July 1 and 24, 2022**

**{¶ 41}** GAL Cook filed reports with updates as to each family member.

**Semi-Annual Review Hearing - July 15, 2022**

**{¶ 42}** Bother parents attended the hearing. Also before the court was a motion to determine the status of father's case plan, as he was added back to the plan on March 10, 2022, but then said he did not want to be on the case plan. Father's counsel indicated father wanted to be on the case plan and father was willing to sign the plan that day.

**{¶ 43}** Father completed no case plan goals, and his last drug screen for the agency on May 4, 2022, was positive for THC and fentanyl. The caseworker attempted to visit or meet with father 11 times, but father did not answer the door or he was a no-show. He visited the children every other week, which went well. Father showed the children a picture of a puppy, and said he and mother bought the puppy.

**{¶ 44}** Mother lived with T.V., whose home was approved for the children. Mother did not work; she received SSDI. She visited the children every other week for two hours, and the visits went very well.

**{¶ 45}** Mother had a positive drug screen for meth on June 27, 2022, and went back into Recovery's IOP (intensive outpatient program), which she attended once a week. It was recommended by Recovery that mother go for inpatient treatment; she did not comply. Mother was unsuccessfully released from FIC, which was considered a case plan fail.

12.

{¶ 46} The agency was concerned that parents were in a relationship, despite mother's claims to the contrary. The parents were seen together many times, including in April 2022, when the caseworker saw them together at Wal-Mart, and in June 2022, when the worker saw them in a car together. The worker addressed the June sighting with mother, but she claimed they were not together and she had been at home all day. Mother also said father was friends with T.V., and went to T.V.'s home for visits. The agency made it clear that if the parents were in a relationship, they were judged as a whole, so father's illegal drug use and noncompliance with the case plan reflected on mother. The agency did not believe mother and father were honest.

{¶ 47} The children were doing very well in their foster placement, their medical needs were met, and there were no concerns with them remaining in the foster home.

{¶ 48} Mother testified she went to Wal-Mart with father a couple of weeks after she was released from Serenity because she did not have a car; she was released on April 5, 2022. She claimed she did not get a puppy with father; he bought a puppy for the children and the puppy was with mother at T.V.'s home.

{¶ 49} Mother was aware of the recommendation for inpatient treatment at Serenity, but said she was told if she "continued to do what I need to do, sign a behavior contract and another piece of paper stating that I will be clean, and do whatever the paper states then I should be okay with * * * continuing with IOP." She did not want to go the Serenity because "they're not very confidential with their information for their clients."

13.

{¶ 50} Regarding mother's positive screen for meth on June 27, 2022, she said, "actually, I wouldn't have graduated IOP if my cup would have come back positive. My cup come back negative. * * * [M]y sister and I have been arguing quite often. She went on and told people that she knew that I'm not going to get my kids back, she don't want me to have my kids back and she'll do whatever it takes for me not to get my kids back." When mother was asked how that translated to a positive screen for meth, she replied, "She's been on the partying kick and I'm not because I want my kids and I told her that. I honestly think she did something to my drink." Mother was questioned about the specific circumstances when she was with her sister, and she said,

It would have been like a Friday or Saturday. Then I found out the previous week after me hanging out with her that she was going around asking people if she knew me, or if they knew and they were like well I know of her, why? And she went about saying well I heard she's not going to get her kids back and she don't deserve them back, she don't you know I don't talk to my sister on that kind of level. I don't want her knowing none of my business, I don't want nobody knowing none of my business unless it comes from my mouth.

{¶ 51} When mother was asked if she knew that drugging someone's drink was a crime, she said she knew now, but would not file a police report because "she's trying to get herself out of her situation. I'm not cool with that." Mother denied using drugs.

{¶ 52} Mother was also questioned about her positive drug screen prior to June 2022; she again denied drug use. She could not remember the background of that previous screen.

{¶ 53} Father testified, and was asked if he would go to the recommended inpatient treatment, to which he replied, "I'm willing to do, I mean just everything's got my mind boggled. I mean." When asked if that was a yes or no, he said, "Yes, most definitely, I mean but." He claimed he was in inpatient treatment for two days, and "went from there to the hospital after that because I needed medical attention and well the Renewed Minds down here in town put me on medication, Suboxone, and that just destroyed me."

{¶ 54} Father was questioned about overdosing on December 11, 2019, and said, "I did not overdose." When asked if he remembered getting Narcan by EMS, he said, "That's kind of why, well okay, now I'm epileptic. I've been on medication for that all my life, Phenobarbital, Dilantin, stuff like that. And uh, but there were no positive screens for anything like that."

{¶ 55} Father was asked about testing positive for fentanyl and he said he took the drug test the day after he got out of the hospital where he was given painkillers for his knee, which he claimed almost had to be amputated. He was asked if he was on painkillers still, and said, "No, I'm not taking no pain killers or nothing like that." He was then asked when he stopped taking prescribed painkillers and he said, "As soon as I

15.

got out of the hospital. * * * So it was like November or December. * * * That was like Percocet that was when I got out of the hospital." Father admitted marijuana use.

{¶ 56} The court ordered mother and father to submit to a drug test "right now while we're here," then report back to court. Mother's drug screen was negative while father was positive for meth, amphet, THC and alcohol.

{¶ 57} Father was sentenced to 30 days in jail, and was ordered to report to jail that afternoon. The court indicated that prior to the expiration of 30 days, if father was accepted to inpatient facility, a transfer from jail to the facility would be considered.

{¶ 58} Mother was sentenced to 30 days in jail, but the court allowed her 15 days to provide verification that she was accepted into inpatient treatment. The court noted, at the end of 15 days, if no verification was filed, mother would serve 30 days in jail.

### Hearing - August 18, 2022

{¶ 59} The hearing was held on the court's own motion; mother was present, father was not. Mother did not go for inpatient treatment; she said it was very difficult to get into treatment because she was not with a provider and she had to care for T.V., who had cancer and received chemotherapy. She claimed she had an assessment scheduled for August 30, 2022, at A Renewed Mind ("Renewed"), after which she could go for IOP and counseling. She offered to go to jail on weekends and take care of T.V. during the week, at least until she found another caregiver. She did not have verification of T.V.'s cancer treatments.

16.

{¶ 60} GAL Cook testified that T.V.'s care was discussed the previous week, so mother had time to make alternate plans for his care. The GAL also noted mother was sentenced to 30 days in jail over eight months ago, so she had opportunities to address the issue.

{¶ 61} The court imposed the 30-day sentence and ordered mother to report to jail the next day.

## Review Hearing - October 25, 2022

{¶ 62} Neither parent was present for the hearing. Mother claimed they were travelling to court together when the car broke down, and they were waiting for the police to help.

{¶ 63} The caseworker reported she conducted a home visit with father outside of the trailer, in September 2022, two days after he was released from jail. He began his case plan; he attended IOP at Renewed, but missed sessions and he went to two parenting classes, then missed one. He tested positive for alcohol and THC, and on October 11, 2022, he was positive for meth. It was unknown if he worked. Father claimed he was selling the trailer, and listed mother's address as his address. He had supervised visits with the children, which went well.

{¶ 64} After mother was released from jail, she attended IOP at Renewed, four days a week. She resided with T.V., and although the caseworker stopped by the home many times to see mother and conduct random drug screens, she was never home and

17.

there were no home visits since May 2022. Mother went to the agency to meet and took drug tests, which were negative. Mother and father disclosed they were together, lived together at T.V.'s home and had supervised visits with the children together. At that point, the agency was not concerned about their relationship.

{¶ 65} The children were doing very well in the foster home where they were placed in December 2021.

{¶ 66} GAL Cook testified the case was in the same place that it was at the last hearing, with miniscule, incremental improvements. Father enrolled in treatment and parenting classes, but missed classes and had positive drug screens. Father never completed any treatment course and never had a negative drug screen. The GAL reported that in early 2022, after a court hearing, father had to be revived with Narcan.

{¶ 67} The court ordered that temporary custody of the children remain with the agency.

### Fifth Semi-Annual Hearing/GAL Report - December 15, 2022

{¶ 68} GAL Cook filed a report with updates with respect to the family members.

{¶ 69} Mother and father were present for the hearing, and also before the court was the agency's motion to extend temporary custody, filed on December 13, 2022. The agency withdrew its motion, as an extension was barred by statute.

{¶ 70} Caseworker Alaina Russell testified the children were doing very well in their foster home, and visited with the parents bi-weekly for two to three hours. Mother

18.

was completing treatment at Renewed and doing well, but she missed dates due to T.V.'s medical appointments; T.V. had since passed away. She had three random drug tests and one test at the agency; all were negative. Mother's last positive drug test was in June 2022. She was on disability, did not work and lived with father at T.V.'s home.

{¶ 71} Father was drug tested at Renewed and was negative for substances in November and December 2022, however during that time, Russell was unable to do home visits with father or drug screens; his last screen, taken the end of October 2022, was positive for THC. Father had a job and worked third shift. He completed two out of ten parenting classes. Visits went very well, and the children were bonded to their parents.

{¶ 72} GAL Cook testified that father made considerable progress, at least on paper, but "it is a touch disappointing that it comes too little too late."

{¶ 73} The court ordered that temporary custody remain with the agency.

## 2023

{¶ 74} On January 31, 2023, the agency filed its motion for permanent custody of the children. On February 2, 2023, the parents filed a joint motion to return the children to their care, as they alleged the agency did not timely file the permanent custody motion.

### Hearing - March 23, 2023

{¶ 75} The court noted two motions were pending: a motion for permanent custody, filed by the agency on January 31, 2023; and the joint motion to dismiss. The

court scheduled a trial on the motion for permanent custody and held a hearing on the motion to dismiss. Both parents were present, and called Melinda Reynolds, the supervisor of the agency's ongoing unit, as a witness.

*Melinda Reynolds' Testimony*

{¶ 76} Reynolds was assigned as the ongoing caseworker for the family in February 2023, and was familiar with the history of the case. She attempted home visits with father in February 2023, but was unable to make contact. His last drug screen for the agency, in mid-December 2022, was negative.

{¶ 77} On January 23, 2023, a police report was received which alleged that father had overdosed. The agency tried to call father that day and the next to have him report for a drug screen; no contact was made and father did not report. Father had claimed that he worked so he was unable to go to the agency, so a caseworker offered to meet him at work, or after, to drug screen him, but father did not cooperate. Father denied drug use.

{¶ 78} Father attended services at Renewed, he tested negative for drugs and was last seen on February 15, 2023. From October 2022 through January 2023, father missed 17 IOP appointments at Renewed. Mother graduated from relapse prevention and continued "to do individuals." Reynolds was unaware of any positive drug screens for mother since October 2022.

{¶ 79} Father and mother told Reynolds they lived in T.V.'s home and father worked.

20.

**{¶ 80}** Reynolds stated substance abuse was a problem which was not resolved or sufficiently mitigated due to father's missed drug treatment appointments and his alleged overdose, where mother called 911 and stated father was turning blue in the face and she was performing CPR on him. The police report indicated there was a strong and overwhelming odor of alcohol on father and there was a white substance in his nostrils.

**{¶ 81}** It was Reynolds' original belief that father was drug tested regularly through the IOP, but she learned he had not been tested in about five weeks.

*Father's Testimony*

**{¶ 82}** Father moved in with mother in August 2022, and was in drug treatment at Ohio Guidestone ("Guidestone")[3] for three or four months; he said "[i]t's been a while. * * * Well, since August [2022]." He claimed his participation had been regular, but he started a job, had job training and had transportation issues, so it was difficult to attend, although he took drug screens. Since February 15, 2023, he said he was at Guidestone consistently twice a week and was drug tested; he did not recall when his last positive drug screen was, as "it's been too long to even recall. * * * I mean it's been past August I mean." He had worked for three months, 40 hours a week.

**{¶ 83}** Father claimed the alleged overdose on January 23, 2023, was caused by blood clotting due to his leg injury, which made him get real hot and faint, and almost caused a heart attack. He admitted he drank that day, but denied drug use. He said he

---

[3] Guidestone was formerly called A Renewed Mind.

went to Renewed on January 24, 25, 26 and 27, 2023, and took drug screens which were all negative. He did not have recent contact with Reynolds because she did not try to reach out to him to have him drug tested or do a home visit. Father said he would move out of the home, if required, so the children could be returned to mother.

{¶ 84} Father was asked if he remembered saying, at a Zoom meeting on January 27, 2023, that a car fell on his chest on January 23, 2023, and took the air out of him; he replied, "I was working on my car and I remember coming in and sitting down and that's, I just got light headed and got real hot." Father was aware the police report stated he had a white substance in his nostrils, but he claimed that was "Foam. Spit. Snot." He did not recall that the report said the police believed that father's two friends, who were present, were also under the influence of narcotics.

{¶ 85} Father was questioned about lying to the agency about his drug use and his relationship with mother, and said, "No, I have not lied. We got back together in August. * * * They seen us together. Like I would go pick her up, take her to the store, stuff like that, I mean, you know but we got back together in August."

{¶ 86} Father acknowledged he had to complete parenting classes, and was working on it but "[t]he woman, Jana, she is having problems cause see my schedule with work and stuff to get me there. I already took five (5) classes of it. Only take ten (10) classes." Father was informed he had only taken two classes, to which he replied, "I got to wait on Jana to get actually room for me to go back in there to take them."

22.

**{¶ 87}** When asked what his sobriety date was, father responded it "would be August. I was in jail for thirty (30) days and after I've got out I've been, so is that, yea, since I've been clean? * * * Yea, it was I would say August." He did not recall testing positive for marijuana on October 26, 2022.

**{¶ 88}** GAL Cook asked father when IOP with Guidestone would be completed and father said next week; father did not know how long the program usually took. Father admitted that on January 23, 2023, he drank three big cans of beer which was like a six-pack. He was asked if drinking was recommended as part of his sobriety and he replied, "It's not anything you know, I mean." He said he drank once in a while, not regularly.

**{¶ 89}** The court asked father about consuming alcohol, and observed that drinking a six-pack at one time seemed to fly in the face of the sobriety issues, to which father replied, "I understand where you are coming from, yea. It was a six (6) pack but it was between me and a friend you know, so, so what I had a total of you know." The court told father he just changed his testimony, and father said, "Uh, yea, I understand where, yea."

**{¶ 90}** Father failed to bring documentation of his Guidestone treatment, but said, "I talked to Lisa yesterday and she was going to fax over paperwork. I could actually get it faxed to [the caseworker] like soon as I leave here. That I have actually been going or you know contact Lisa and have her get a hold of the caseworker."

23.

{¶ 91} GAL Cook observed that based on father's testimony, his drug use was not seriously mitigated and there were many occasions when his sobriety was called into question, even by father's own testimony.

{¶ 92} The court allowed the parties time to file Findings of Fact and Conclusions of Law, as to whether the cases should be dismissed since timeliness was not met, or whether the court had jurisdiction so the cases could go to trial. The court recessed.

### Judgment Entry on Joint Motion to Dismiss - April 20, 2023

{¶ 93} The juvenile court found that it retained jurisdiction of the cases, and denied the parents' motion to dismiss. The court's findings are more fully set forth below, under mother and father's first assignments of error.

### Mother's Motion to Return Custody

{¶ 94} On April 14, 2023, mother filed a motion to return custody of the children to her or to grant legal custody to paternal grandmother. In May 2023, mother withdrew her motion to grant legal custody of the children to paternal grandmother.

### Permanent Custody Trial - Day 1, May 19, 2023

{¶ 95} Two motions were before the court: the agency's motion for permanent custody and mother's motion to return custody of the children to her. The court reserved its finding on mother's motion until after testimony was heard. The trial on the motion for permanent custody trial proceeded. Mother attended the first, second and fourth days of trial, father did not attend the trial.

24.

**Sgt. Jason Sprague**

{¶ 96} The sergeant was called as a witness by the Williams County prosecutor, and testified to the following. He worked for the Montpelier Police Department ("MPD") and on December 11, 2019, he received a medical call that a person got out of bed and collapsed on the floor. Upon arrival at T.V.'s home, father, T.V., mother and mother's two older children were present. Father was on the floor, pale, snarling when he breathed and with an accelerated pulse rate, which were all general signs of an overdose. The sergeant was also aware of father's history of drug abuse, and it was suspected that father used heroin. Narcan was administered and eventually father became conscious.

{¶ 97} Father claimed he had a sleeping disorder and denied using drugs, even though the sergeant explained that Narcan only disrupted an opioid overdose, and given father's reaction to Narcan it was pretty obvious what happened. Father was given an immunity letter, which gave a drug abuser 30 days to check into rehab or potentially face criminal charges. Father did not go to rehab, nor was he criminally charged.

**Lt. Darrell Higbie**

{¶ 98} The lieutenant was called as a witness by the prosecutor, and testified to the following. He worked for the MPD and on July 15, 2022, around noontime, he responded to a med call that a male was breathing, but unresponsive. When Lt. Higbie pulled up to the house, he recognized it and knew mother, father and T.V. lived there.

25.

Father was on the floor of the garage and life squad treated him for a possible drug overdose, due to a previous incident.

{¶ 99} Lt. Higbie spoke with T.V., who said father was at court that morning and had to report to jail later that day. Mother arrived and was told father overdosed again. She said father was not supposed to hang out with Troy Smith, who trafficked drugs. Father was revived with Narcan, and wanted to know what was going on. Father was asked what drugs he took; he said he did not take any drugs. Father was informed that Narcan only worked on opioid use, not heart attacks, strokes or epilepsy. The lieutenant looked for evidence of drugs in the home, but found none. Father refused to go to the hospital, and was not charged with a crime.

{¶ 100} The lieutenant did not recall being told at the scene that father tested positive at court that morning for meth, amphet, THC and alcohol. Based on that information, Lt. Higbie believed that father did some type of opioid between the time he was in court and the time he became unresponsive.

**Patrolman Austin Batt**

{¶ 101} The officer was called as a witness by the prosecutor, and testified to the following. He worked for the MPD and on January 22, 2023,[4] he received a call for a full

---

[4] Two dates were referenced regarding father's alleged overdose: January 22 and 23, 2023. We will refer to January 23, 2023.

26.

arrest, which was believed to be an overdose. The officer was advised that mother called, and she was performing CPR.

{¶ 102} Upon Officer Batt's arrival at the house, mother said father was dead and was blue in the face. She accused father of using an illegal substance that he got at Circle K. Mother appeared normal but distraught, and she looked frustrated with father as she believed he used illegal drugs and overdosed.

{¶ 103} The officer found father was alert and conscious, but heavily intoxicated. Father had a strong odor of alcoholic beverage coming from his breath, there were white crystal-like debris hanging out of his nostrils, his eyes were bloodshot and glassy, his speech was slurred, he was unable to have a conversation, he thought everything was funny, he could not maintain his balance, and he had body tremors. Father admitted drinking five 24-ounce cans of Milwaukee Ice Beer, but denied taking any illegal substances or overdosing. Father claimed he fell asleep and was epileptic; he did not mention a blood clot. Father's heart rate was high, which was an indicator of being under the influence of a stimulant like meth or cocaine. Father was not given Narcan and he refused to go the hospital. He was not criminally charged, as no drugs or paraphernalia were found.

{¶ 104} The officer recalled that father's cousin and a friend were also at the house and they both had indicators that they were under the influence, as they had

27.

bloodshot, glassy eyes, they had body tremors and could not maintain steady balance. The cousin said father was unconscious, and the cousin breathed for father.

{¶ 105} Officer Batt believed mother and father were girlfriend and boyfriend, as the officer stopped father's car the previous week for a traffic violation at which time father said he was trying to get home, where he lived with mother.

**Attorney Abigail Wurm**

{¶ 106} Wurm was called as a witness by the prosecutor, and she testified to the following. She was an attorney for the estate of T.V., who died on December 13, 2022. Mother and father lived at T.V.'s home at the time of T.V.'s death. T.V. had a will which provided that five beneficiaries, including mother, were to split the estate.

{¶ 107} Mother was advised that she and father could stay at T.V.'s home, and pay the utilities, until mother was able to secure financing to purchase the home. Mother could not get a loan, so on January 26, 2023, a thirty-day notice to vacate the home was served. At that time, Wurm noticed a door hanger on the house which stated the village would shut off utilities as of January 31, 2023. Wurm learned that mother and father had not paid the utilities, as they promised. Wurm also learned the utilities were shut off.

{¶ 108} Wurm received verification that mother and father had vacated the home on February 20, 2023; the locks on the home were changed and the home was listed for sale. When mother and father vacated the home, there was nothing left in the home; the stove, refrigerator, washer, dryer, all of the appliances were gone.

28.

{¶ 109} Wurm testified that T.V. had a 2003 Chevy Trailblaze which showed up on Facebook on January 23, 2023, as having been sold by father for $250. Wurm was not aware that father had authorization to sell the vehicle, and she knew he did not have a title to the vehicle. A complaint against father was filed with the police department.

{¶ 110} Wurm estimated that mother may receive $15,000 to $18,000 when T.V.'s estate closed, which was anticipated to be in the fall of 2023.

**Jana Richards**

{¶ 111} Richards was called as a witness by the prosecutor, and she testified to the following. She was a counselor at Shalom Counseling and Mediation Center ("Shalom"), and also was the supervised visitation coordinator and parenting instructor.

{¶ 112} Richards supervised the parents' visit with the children. Father was referred for supervised visits at Shalom in May 2021, mother was referred in June 2021. Richards was instructed to schedule visits every other week, for two hours, but there were gaps in the visits due to mother's inpatient treatment and father's incarceration and inability to pay for visits. Visits ended in February 2023.

{¶ 113} Richards directed mother's parenting classes, which started with orientation on April 8, 2021, and ended December 2, 2021, when mother completed the classes. The gap between mother's orientation and classes was due to her positive drug screen in late April 2021, and subsequent inpatient treatment.

29.

{¶ 114} As for father, he was referred for parenting classes on September 28, 2022, and he completed two out of the ten required classes. After he missed two classes, he was "pulled from group and then he would have to start the next cycle." During supervised visits with the children, father mentioned the parenting classes to Richards, and he was informed that he had to reach out to remind her at another time; he never did.

{¶ 115} Richards' general observations of mother and father's visits with the children were "[l]ots of love and affection * * * praise and encouragement," and there were no issues with the parents at visits. Richards observed mother applying what she had learned in parenting classes at the visits, definitely the positive aspects, although mother could improve on providing consequences for behaviors. Richards recommended unsupervised visits for mother and father with the children.

**Lisa Michel**

{¶ 116} Michel was called as a witness by the prosecutor, and she testified to the following. She was a behavioral health counselor at Guidestone, formerly Renewed. She was mother and father's counselor, although they saw other providers too. Mother was in group, while father saw the nurse and nurse practitioner.

{¶ 117} Mother had her assessment on September 28, 2022, and was directed to take IOP and individual counseling; she did really great. Mother was drug screened, usually twice a week, and had no positive screens. Mother missed some appointments, but it was not enough to be removed from the program, as she always contacted Michel

30.

to let her know. Michel had no concerns with mother during her treatment, as every recommendation was completed and mother was discharged on April 4, 2023.

{¶ 118} Father started services in April or May 2021, and was discharged on June 1, 2021. He was in rehab for one day, June 8 to June 9, 2022, and went back, in October 2022, for counseling with Michel and medication assisted treatment ("MET").

{¶ 119} Father did well at first with counseling, but then missed appointments. During the fall of 2022 and winter of 2022-2023, he was supposed to go to Guidestone four days a week, but from November 2022 through April 2023, he missed 24 appointments and was removed from group. Father was drug screened by Michel twice a week; he was positive for THC and alcohol on November 2, 2022, but had negative screens thereafter.

{¶ 120} Father was in MET and on Suboxone from October 4, 2022 until December 1, 2022, when he was discharged for noncompliance. He was drug screened by MET and was positive on June 8, 2022, for meth, amphet, alcohol, fentanyl, norfentanyl and THC, and on October 25, 2022, for THC and Hydromorphone.

{¶ 121} Father completed IOP, which had 36 sessions, but did not complete the step-down, relapse prevention, which had 12 sessions and was part of the programming. If father were to contact Michel, residential treatment would be recommended.

31.

{¶ 122} Regarding mother and father's relationship, Michel was initially told they were friends, then she found out they were together. In April 2023, mother told Michel that she broke up with father.

{¶ 123} Michel was aware that father allegedly overdosed on January 23, 2023, and noted that he did not take a drug screen until January 26, 2023. She was asked if she would challenge father's March 23, 2023 testimony, that he was very compliant with Guidestone and his treatment, as untruthful; Michel responded she would.

**Jerome Pete Reed**

{¶ 124} Reed was called as a witness by the prosecutor, and he testified to the following. He was employed as a certified scientist with Forensic Fluids Laboratory ("FFL"), which specialized in oral fluid drug testing. He mentioned that drugs in the blood also affect saliva. Reed stated it was virtually impossible for FFL's tests to have a false positive. He also said you could not test positive for meth if you sat next to a user, kissed or had sex with a user.

{¶ 125} Reed recalled that FFL processed drug tests for mother, as requested by the agency, and there were three positive results: on April 29, 2020, positive for oxy; and on April 19 and May 28, 2021, positive for meth and amphet. He explained that the body tried to excrete meth by converting it to amphet, and with ADHD drugs, like Adderall, a drug test would also be positive for amphet. Reed noted meth use could be detected in oral fluid for up to about 18 hours.

32.

{¶ 126} FFL processed drug tests for father, as requested by the agency, with the following positive results: on May 10, 2021, positive for THC; on May 21, 2021, positive for meth, amphet, THC, cocaine, Benzoylecgonine ("BZE") and Ecgonine Methyl Ester ("EME"); on June 4, 2021, positive for meth, amphet and THC; on October 5, 2021, positive for THC; and on October 14, 2021, positive for meth, amphet and THC. Reed explained that the body broke down cocaine into BZE, and then EME.

{¶ 127} Reed noted the medications father listed for November 2, 2021, were oxy and enoxaparin (which is a blood thinner, not used for epilepsy), yet father's drug test was positive for meth, amphet and THC; no listed medications were found. On November 19, and December 16, 2021, father was positive for meth, amphet and THC; on December 27, 2021, he was positive for Percocet (which is oxy), meth, amphet and THC; on May 4, September 13 and October 26, 2022, he was positive for THC; and on March 23, 2023, father was positive for fentanyl.

{¶ 128} Reed explained that fentanyl use could be detected in oral fluid for up to about 24 hours, and THC (by smoking marijuana) can be detected for up to 36 hours.

{¶ 129} Reed noted father had one negative result, which was on December 15, 2022.

{¶ 130} Reed observed that it took an extensive amount of time of chronic drug use to register a positive in a hair follicle test. Chronic drug usage would be several times a week for several months before the drug would register on a hair follicle test.

33.

**Melinda Reynolds**

{¶ 131} Reynolds was called as a witness by the prosecutor, and she testified consistently with the testimony she offered at the March 23, 2023 hearing on parents' motion to dismiss. In addition to that testimony, she testified to the following. At the agency, she worked as a social services supervisor where she oversaw the ongoing unit in all ongoing cases, and sometimes worked as an ongoing caseworker. She was the supervisor for the family since April 1, 2021, and was assigned as the caseworker in 2023. Four other agency employees had worked on the case at times, since August 18, 2020.

{¶ 132} Regarding father's overdose in December 2019, the agency's notes showed that mother's two oldest children and M.M. were present, and the oldest child and T.V. performed CPR on father. The agency opened a case, substantiated for physical abuse, but the case was not transferred to ongoing services and was closed.

{¶ 133} On April 29, 2020, the agency received a report that mother tested positive for illegal drugs while giving birth to B.M., but she denied the use of drugs other than Zantac, Gabapentin and Amoxicillin. She admitted that father used THC, but claimed no other substances were used in the home. On May 12, 2020, mother claimed she did not realize she was in active labor so she took two Percocets for pain, and in the hospital, she was given oxy every six hours.

34.

{¶ 134} Mother sent the agency an email on May 2, 2020, indicating she was not together with father, and he moved to Kentucky, as his other children were "being adopted out."

{¶ 135} On May 28, 2020, mother was drug tested by the agency, and was positive for meth and amphet; she denied ever using meth. Shortly afterwards, the children were "safety planned" with T.V., and case plans were created.

*Case Plans*

*Goal*

{¶ 136} The initial, overall case plan goal was reunification of the family.

*Housing*

{¶ 137} In April 2020, when the agency became involved with the family, mother lived at T.V.'s home. On September 28, 2020, mother indicated that father was back in town. On October 13, 2020, mother reported that father moved out and moved into his mother's house in Defiance, Ohio.

{¶ 138} On December 11, 2020, mother reported she bought a trailer and would move in January 2021, which she did. On March 1, 2021, mother reported she had been back and forth between T.V.'s home and the trailer, as she was working on getting the bathroom fixed. On April 22, 2021, a caseworker went to the trailer unannounced and father opened the door; he became upset, refused a drug screen and refused to work with

35.

the caseworker. On October 28, 2021, the agency learned that mother did not own the trailer and that she moved to T.V.'s home.

{¶ 139} On October 26, 2022, father notified the agency that he lived with mother in T.V.'s home and was no longer living in the trailer.

{¶ 140} A March 25, 2023 police report indicated that mother and father were living together on Vine Street in Sherwood, Ohio, but on April 17, 2023, father emailed the agency that he was moving to Lexington, Kentucky. On April 21, 2023, mother reported that she did not live at T.V.'s home; she stayed with friends or family or in her car. Mother's address was requested for eight weeks, and the day before the May 19, 2023 trial, mother emailed a signed a lease for the Vine Street trailer ("Vine trailer").

{¶ 141} Reynolds noted the agency only communicated with father via email, as there were occasions when he was very threatening with a caseworker. Reynolds had not emailed father since April 2023, because he had responded to her emails with "LOL" when she asked him for his address or where he was. The day before trial, Reynolds saw that father's Facebook post said he was in Fremont, Ohio.

*Home Visits*

{¶ 142} Reynolds was not able to conduct home visits in March, April or May, 2023, for mother or father.

36.

*Employment*

{¶ 143} Mother reported that she received $400 a month in SSDI, and the children also received SSDI, which money was redirected to the agency. Reynolds believed that if mother had housing and the children were returned to her, she would get over $1,000 per month.

{¶ 144} Father reported, on May 24, 2021, that he worked at Mansion's; he provided no verification. On October 4, 2021, he told the caseworker he received SSDI and did side jobs, and on October 15, 2021, he reported that he worked in Michigan; he provided no verification. On November 25, 2021, he reported he injured his leg and was not working.

{¶ 145} On May 4, 2022, father claimed he worked at a tire place by the Ford dealer in Bryan, Ohio; he provided no verification. On July 15, 2022, he indicated he worked at an oil change place in town; he provided no verification. In August 2022, father was in jail and did not work. In November 2022, the agency received proof that father collected SSDI.

{¶ 146} On January 23, 2023, father reported that he worked at CK Technologies; he showed his ID badge and confirmed his employment.

37.

*PRC Application*

{¶ 147} Mother completed her application; it was approved in June 2021. Father was given six applications before he completed one, which was approved in November 2022.

*Visitation and Parenting Classes*

{¶ 148} There were no issues with parents' supervised visits with the children, except that mother struggled to follow through with discipline. The agency gave the parents gas vouchers for visits with the children. By February 2023, parents were allowed additional visits, which were supervised by the foster mom. Mother was very respectful with the foster parents, and father typically did not interact with them.

{¶ 149} Reynolds noted that generally when reunification is the goal, parents started with supervised visits, then moved to unsupervised visits to transition their children back into the home before their children returned home. However, mother and father always had supervised visits because, throughout the case, mother was dishonest with the agency about her relationship with father, so she did not build trust with the agency. Reynolds was aware that in January 2023, a joint motion was filed by the prosecutor's office requesting unsupervised visits for the parents, which showed it was not the agency's decision for the parents to have supervised visits with the children.

**{¶ 150}** Mother attended and completed all required parenting classes by December 2021, while father attended two classes out of ten and never completed the parenting class goal.

*Home Visits*

**{¶ 151}** The agency required visits with the parents every month, with home visits every other month, some of which were unannounced; it was mandated that the agency make three attempts a month for a home visit. The other visits were held at the agency or a neutral site.

**{¶ 152}** For mother, home visits were unsuccessful in May and November 2022 and February 2023, while visits were successful in July and December 2022 and January 2023, but two attempts were be made before visits occurred. No home visits were attempted in March, April and May 2023, because mother did not provide her address to the agency.

**{¶ 153}** With father, home visits were not successful in September, October, November and December 2020; January, April and July 2021; April, June and December 2022; and January, February and April 2023.

*Substance Abuse, Drug Screens and Mental Health Treatment*

**{¶ 154}** In November 2020, mother engaged in treatment at Recovery, disengaged in February 2021, and reengaged in March 2021. She was accepted at FIC in February 2021. FIC was an intensive program, with four phases, starting with weekly meetings

39.

between the parent and a treatment team of providers, which included the agency's director, then meeting every other week, then every three weeks, and finally, a meeting every four weeks until the parent graduated and was discharged from the program. Mother was unsuccessfully discharged from FIC.

{¶ 155} In April 2021, mother was admitted for inpatient treatment at Serenity. In May 2021, it was reported to the agency that mother was having regular contact with father, she did not follow the rules when it came to father, and she appeared very co-dependent. In August 2021, mother was successfully discharged from Serenity.

{¶ 156} Mother tested positive for meth on September 1, 2021, but denied using; she claimed she had sex with father the night before, which made the test positive. She also was positive for meth on September 22, 2021.

{¶ 157} In December 2021, a contempt hearing was held because mother was tested by FIC and was positive for meth, twice. She was found in contempt and ordered to attend inpatient treatment.

{¶ 158} Mother was admitted to Serenity again, in January 2022, and released in April 2022. On July 7 and 15, 2022, Recovery tested mother and she was positive for meth; she denied using drug, and claimed her drink was spiked by her sister. In late September 2022, mother informed the agency she switched services to Guidestone, and no longer wanted to go to Recovery or complete inpatient treatment. In April 2023, mother successfully completed treatment at Guidestone and was discharged.

40.

{¶ 159} Father was assessed at Guidestone, in April 2021, and IOP was recommended, but he failed to follow the recommendation. Father was referred to FIC, a meeting was scheduled but he did not appear. Father was denied admission into FIC.

{¶ 160} In October 2021, father was assessed at Recovery and tested positive for meth, amphet and THC; treatment was recommended. Father was discharged from Recovery in December 2021, due to lack of attendance.

{¶ 161} In January 2022, father requested to be removed from the case plan, as he was facing contempt charges; he was removed. In March 2022, father asked to be placed back on the case plan; he was added to the case plan. The caseworker told father the agency wanted him to go to inpatient treatment, but he said he did not have time to do that. Father also said he never wanted to be on the case plan.

{¶ 162} In April 2022, father had another assessment at Guidestone and residential treatment was recommended; he refused to go saying that place does not help and there are more drugs there than on the streets. In June 2022, father went to inpatient for one day, then disengaged from services until he was assessed again at Guidestone in October 2022. IOP was recommended, but father quit attending all services in March 2023.

{¶ 163} Father refused to drug test for the agency in: August 2020; April 2021; March 2022; and January 2023, following the alleged overdose.

41.

*Parents' Relationship*

**{¶ 164}** Mother and father claimed on numerous occasions that they were not in a relationship, but the agency believed otherwise. When mother was in Serenity for the first time in the spring of 2021, she had contact with father and it appeared, at that time, that she had no intention of ending her relationship with him. In August 2021, mother indicated to the agency she had broken up with father, but in a jail video from September 23, 2021, she told father she was going to tell the court what it wanted to hear, which was that they broke up, but she had no intention of breaking up and throwing away five years.

**{¶ 165}** On October 15, 2021, mother told the agency she and father were together and possibly moving to Michigan. On December 3, 2021, mother reported that she had broken up with father, and on April 6, 2022, she said she was finished with him for good.

**{¶ 166}** On April 26, 2022, the agency received a police report stating that father was charged with falsification for pawning a gun in Defiance, Ohio. Father indicated to the officer that the gun belonged to his girlfriend (mother), but he pawned it because she did not have her license on her at the time. Later, father requested the gun back and filled out an ATF form which reflected that he had no previous misdemeanor domestic violence charges, but father had a domestic violence conviction in Bryan, Ohio, and it was presumed that mother was the victim. Reynolds knew it was illegal, under federal law, for father to own a firearm. Father admitted that he lied on the form, and faced charges.

42.

Reynolds was concerned that father had a firearm, as he had made threats against the court and the agency, saying he would blow that place up and they are all going to pay; it was unclear to which place father was referring. Reynolds also learned of domestic violence accusations made against father in Kentucky by his other children's mother.

{¶ 167} Reynolds noted that the parents were seen together at Wal-Mart in April 2022, father asked the children at a visit if they saw the puppy that he and mother bought together, and through most of the case, mother used father's last name on Facebook.

{¶ 168} Mother was told at the March 23, 2023 hearing that if she was not with father, she could potentially have the children returned to her. Father had a Facebook post saying he and mother had broken up and were living separately. However, Reynolds learned from father's mother that from March through May 2023, the parents lived together.

*Parents' Other Children*

{¶ 169} Mother has two older children, and one child's biological father had legal custody.

{¶ 170} Father had two older children, but his parental rights were involuntarily terminated for these children in August 2020, in Kentucky.

*Foster Parents*

{¶ 171} The children were the same foster parents since the emergency removal in December 2021. The children were happy, settled and very bonded with the foster

43.

parents, they go on vacations together. The children have their own beds, own rooms, own toys and own clothes at the foster home. The foster parents wished to adopt the children. The foster parents communicated with X.H.'s foster parents and the children have regular contact with X.H., which would continue if the agency were granted permanent custody of the children.

*Opinions*

{¶ 172} Reynolds opined it would be disruptive to the children, especially M.M., if there were a placement change. In Reynolds' training she learned that every move for a child was traumatizing, and children who were disrupted constantly or had placement changes were more likely to have mental health issues, more likely to struggle in school, and less likely to go to college.

{¶ 173} Reynolds' opined it would be in the children's best interests for them to be placed in the permanent custody of the agency, and for the permanency goal to be changed to adoption. Reynolds believed if the children were returned to mother, CPS would likely have to continue its involvement, and the children would continue to have placement disruptions and changes. The children needed a legally secure, permanent placement.

**Thomas Custer**

{¶ 174} Tom was called as a witness by the prosecutor, and he testified to the following. He was father's stepfather and was married to Debbie Custer, father's mother,

44.

for 14 years. Tom did not know the children well, he thought M.M. may know him and Debbie, but B.M. had only been to the Custer home twice. The Custers did not have visits with the children while they were in foster care, because "it was two (2) years before we even knew they were there." Tom learned the children were in foster care two or three months prior to trial when the agency contacted him and Debbie about taking custody. Tom said he and Debbie were older and had too many health issues to run after and raise little kids.

{¶ 175} The Custers had a close acquaintance-type relationship with mother, and Tom thought she was a good parent. Tom has a "labored" relationship with father; if father got what he wanted, he was good to be around, but if father got mad, he was a whole different person - angry and making threats. Tom tried to keep his distance from father, as father threatened to beat Tom up, mop the floor with him and put him in a pine box. Tom said he and his wife were not afraid of father, Tom just does not want the drama. Tom recalled that father said the Defiance Police stopped by, and father talked with them.

{¶ 176} Tom remembered that from January 2023, until about a month ago when the Custers told the agency they would not take the children, mother and father were at the Custer home two or three times a week, and father came out one time without mother. Tom said mother and father took showers at the Custer home. After father was notified

45.

that the Custers would not take the children, he threatened Debbie, so she blocked him on the phone and everything.

{¶ 177} In about April 2023, when mother called Debbie and asked for Narcan, Tom overheard the call. Mother said she was out and when she got home, she found father comatose and she did not know what he did or took. Debbie told mother to take father to the hospital or call 911. A few hours later, mother and father arrived at the Custer home and father had slurred speech, "a little balance," and was under the influence of something. Tom said father drank, but did not admit to doing drugs. Tom said he does not believe that father knew what the word "honesty" meant, as father had a delusional version of the truth. Tom said father had five children, with three women. Tom thought father knew how to manipulate mother, and was good at it.

{¶ 178} Tom saw mother the day before trial when she came out to the Custer home to retrieve the children's clothes, dressers, car seats and things. The items were at T.V.'s home, but were moved to the Custer home when mother and father left T.V.'s home.

{¶ 179} Tom saw and talked to father the morning of trial, at the Vine trailer. Tom went to get his ladder and rake which he lent to father, as "there was a big falling out." Tom and his brother found the Vine trailer because a dresser mother picked up the night before "sat right there." The two men went to the back door, which was unlocked,

46.

and opened it; the brother said someone was inside, so Tom looked and father "popped out and he started doing the [father] thing." Father said he just woke up.

{¶ 180} Tom told the prosecutor, when he talked to her the previous weekend, that mother and father were still together, and lived together on Vine Street. However, when Tom spoke to mother the night before trial, she said father left.

{¶ 181} Tom does not know what mother and father's living arrangement was, but father told Tom that he and mother had slept in the Wal-Mart parking lot. Father said mother bought a trailer after T.V. died, and father was fixing it up. Tom said after T.V. passed away and mother and father had to move out of T.V.'s home "the world flipped upside down." Mother and father asked to stay at the Custer home and were told no, although Tom said mother was welcome anytime, but without father.

{¶ 182} Tom talked to mother the day of trial during a smoke break, and she asked Tom what father was doing at the Vine trailer.

{¶ 183} Tom believed the children should be returned to mother, but should not be returned to father.

**Foster mom**

{¶ 184} Foster mom was called as a witness by the prosecutor, and she testified to the following. She was a married, third-grade teacher and her husband was a pipefitter. The children have lived with the foster parents for one and a half years; M.M. was three years old and B.M. was one when they entered foster care. At first, M.M. cried a lot and

47.

it took time for her to get used to the foster parents and daycare centers, but she really improved. B.M. was a go-with-the-flow kid, so the transition was easier for him.

{¶ 185} M.M. was silly and all girl, and she liked to do girl stuff with foster mom. M.M. and foster dad were the silliest together, as foster dad was the play around person, and M.M. loved to hang out with him. M.M. was really loving with the foster parents, as was B.M., who was also very cuddly. The children loved to go outside to play with foster dad, they rode bikes and scooters, played and hiked in the woods, took the dog for a walk, and swam and went to the zoo in the summer.

{¶ 186} The children improved a lot, especially their speech, as the foster parents worked with them since they arrived. Daycare helped the children improve socially and also helped their speech. The children were really good with other kids. B.M. was in Head Start, and the children both had IEPs for speech at their school in Bowling Green.

{¶ 187} Foster mom was pregnant with her first child. The children are treated as part of the foster family, they were very bonded to each other, they played really well together for the most part, and slept in the same room, as they did not want to be separated.

{¶ 188} The foster parents wanted to adopt the children, as they were a part of the family for almost two years, and the foster parents were definitely comfortable keeping the children long-term.

48.

**{¶ 189}** Foster mom believed if M.M. were disrupted again and moved around, back and forth, it would be hard and confusing on her to adjust to different settings. With B.M., foster mom would be concerned about his behavior, because when B.M. met someone new at daycare, he had behaviors, but "after they kind of get his number, he's better." Foster mom was worried that B.M. would develop poor behaviors if he was around different adults and had to go back and forth.

**{¶ 190}** Recently, foster mom supervised visits between the children and mother and father; foster mom and mother made the arrangements. Outside of visits, foster mom had no contact with father. The visits were roughly every two weeks for two hours or so, at a place like the park or McDonald's. Mother was very loving towards the children and they were excited to see her, but they got a little wild and hyped-up with father, which was not that concerning. The children were bonded with mother and father, and talked about them all of the time. X.H. was also at visits, as his foster parent brought him. The children loved to see X.H., and he was very sweet and caring to them. X.H. came to B.M.'s birthday party at the foster home, and was really great with the kids. If the foster parents adopted the children, visits with X.H. would continue. Foster mom believed the children needed consistency and that it was in the children's best interests to remain with the foster parents permanently.

**GAL**

{¶ 191} GAL Cook was called as a witness by the prosecutor, and he testified consistently with the testimony he offered at previous hearings. The GAL also testified that the children needed a legally secure, permanent placement, and permanent removal from mother and father was probably in the children's best interests, as were permanent custody and adoption.

**Melinda Reynolds**

{¶ 192} Reynolds testified about the children's previous placements with family members, and the efforts made to try to place the children permanently or long-term with relatives.

**Mother**

{¶ 193} Mother testified to the following.

*Parents' Relationship*

{¶ 194} Around the time of B.M.'s birth, mother and father were off and on, and not "solely together." After B.M. was born, father took off. She was unaware that father had his parental rights to two children terminated in 2020.

{¶ 195} Mother acknowledged that some time before the September 2021 jail phone call between her and father, she was probably told she should not be with father if she wanted the children back.

50.

{¶ 196} In the fall of 2022, mother was on and off with father, and "all I wanted to do was give him the benefit of the doubt and change for his children. * * * I like stayed away for a while and he kept coming back saying oh he's going to change.  You know he's going to do this, he's going to do that, but * * * he never did."

{¶ 197} At the March 2023 court hearing, mother told father "if you fail this drug screen, I'm done. Like I'm done done.  I can't do it no more. * * * I'm tired of looking at somebody that's saying you know that they're clean and sober to my face but in reality they're lying.  I'm done with it."  She claimed that she ended her relationship with father "[a] few days later after I got the positive drug screen from [the agency]."  She admitted she was a little fearful that father may hurt her, as "he's made threats to me as well in the past but nothing you know, physical really. * * * I want to invest in pepper spray just in case if something was to happen.  I don't want no firearm, no nothing you know that could be potentially dangerous for my children to be in reach of."  When asked about the gun that father sold, she admitted it was her gun but claimed she did not have much to do with it, since she was in Serenity at the time.

{¶ 198} Mother was asked about the foster mom's testimony that for the last two visits, mother and father arrived together; she replied, "No.  The last visit which was on the * * * (12th) I was there waiting on [the foster mom.]  [Father] wasn't even there.  [M.M.] asked where her daddy was and I said I didn't know.  About * * * (5) minutes later he come walking up."

51.

{¶ 199} Mother was asked about Facebook messenger and text messages between her and father; she said there were no texts and she messaged him on Facebook to "send him odd jobs, that's it. On Facebook. You know try to help him make money that's it." She did not know the last time she messaged him "[c]ause my phone, I don't have internet so when I get internet, like in Sherwood it spaces out and I something I click one person and it pops up another person. I don't know why. I'm about to just get rid of the phone completely and go back to flip phone." She claimed she did not have internet on her phone or at the Vine trailer.

{¶ 200} Mother was asked if she married father, as indicated on Facebook, and she replied, "No, absolutely not. * * * At one point we were engaged [in 2017]. The whole situation with Facebook and my name. I was illiterate. I'm not going to lie. I could not for the life of me figure out how to change my last name back to [her maiden name]. But that is my legal name."

{¶ 201} Mother claimed the domestic violence committed against her by father in 2018 "was more verbal. It wasn't physical." Father was ordered by the court to have no violent or threatening contact with mother and to complete Thinking for a Change, and he was placed on probation, which he unsuccessfully completed.

*Visits*

{¶ 202} At the time of trial, S.O., was in JRC [Juvenile Residential Center] in Bowling Green; mother thought he was charged with "rape one * * *. And I don't know

if it was gross sexual." She believed the victim lived in the home with S.O. Mother talked to S.O. "once a week. I video Zoom him when my internet wants to work once a week and I can see him once a week in person." She did not see S.O. every week "considering it's an hour away and my funding is kind of short because of everything right now but I do go see him when I can." She had not seen S.O. in person for three weeks.

{¶ 203} Mother stated she had every intention of starting unsupervised visits with the children, maybe in October 2022, when T.V. was still alive. She was ready for the children, as "I had the beds made. I had the beds put together. Everything for [caseworker Alaina] to come check it out to start doing unsupervised visits. I never once got an email, call, anything for her to say hey I'm not able to make it to get these unsupervised visits."

{¶ 204} Mother was asked if she picked up father for parenting time, and she said she did not and she also did not tell him when the visits were, but "[w]ith my car issues like when I go to Bowling Green or even you know, from Sherwood to Bryan I let somebody know where I'm going and usually it's a third party that relays the message to him."

*Home Visits*

{¶ 205} Testimony was presented that it was sometimes difficult to reach mother, to which she responded, "[i]n November my grandpa was diagnosed with SCLC which is

small cell lung cancer in June of * * * (2022). From that day until December * * * (13th) the day that he had passed away, I was his sole provider, caretaker. * * * So like when they were to come to the house, I could have very well been in Toledo with my grandpa for his [chemo] treatment."

{¶ 206} Mother was asked who took care of T.V. while she was in jail for 30 days in August and September 2022, and she replied, "[m]y mom would come and check in, you know every couple days. I talked to him on the phone every day just to make sure, you know, he was still okay."

*Employment*

{¶ 207} Mother did not have a job, but "I try to do whatever I can, like on the side as like a gig job just to get extra money." She helped people with yard pick-up and she babysat. Mother's only health problem was her back, which limited her employment options because she could not stand for long periods of time.

*Drugs/Treatment*

{¶ 208} Mother was questioned about hospital records which indicated B.M. showed signs of withdrawal at birth and she tested positive for oxy, meth and amphet, but she denied drug use. She said "[t]hey never asked me." She admitted that she used drugs during her pregnancy "[j]ust one time. That was it. One time. * * * And honestly I think that's what put me into labor. Because he wasn't supposed to be due till actually May * * * (19th)."

54.

{¶ 209} As to positive drug screens, mother said, "I haven't had a lot of honesty * * * throughout this case. I did make a poor choice. * * * I don't have a desire to even go back to that [drug use]." She acknowledged she went to Serenity twice for inpatient treatment, and went back the second time "[b]ecause I failed another drug screen." She said the second time was helpful as she was able to work on her mental state to get out of the extreme depression and high anxiety that she had.

{¶ 210} Mother claimed she had a rough time with FIC and felt like she went nowhere, so she failed to complete it.

{¶ 211} Mother called Debbie (father's mother) in or about April 2023, and asked for Narcan for father who was "[n]ot horribly" comatose, as his eyes were open and "he could walk but not a whole lot." Mother stated that earlier that day, they went to the Custer house and father "had a really bad headache and she [Debbie] gave him medicine. I don't know what it was. I don't know anything because I wasn't even in that room. * * * Then we left and later on I called. For Narcan because I don't know what she gave him. Obviously, she's got Narcan for a reason. Is it something she gave, did she give him her medication? * * * I don't know." Mother did not call 911, although she drove father to the hospital, but he would not get out of the car. Then, they returned to the Custer house and father "was completely fine. Like his speech was still a little slurred."

55.

{¶ 212} Mother admitted she used meth, as "I, you know I have went through down a rough path of like emotional distraught, physical, mental and like, I worked my way out of that to be where I am right now."

{¶ 213} Mother also admitted that the agency helped her quite a bit, as the agency was "working with me to try and save my children. The only thing like I get would be like the proper housing and more assistance. Like I only get * * * ($23) a month in food stamps. Half of my check is gone because of my kids, paying for them. How am I supposed to even, but I do that's why I try to get any kind of side job I can make a little extra money for. And put it towards bills or extra food or something. But I'm going to reapply for food stamps * * * today. * * * You know I hit up the food banks, I'm not ashamed to hit up you know a food bank."

*Alleged Overdoses*

{¶ 214} Regarding the December 2019 incident, mother said she was present, as was T.V., S.O., X.H. and M.M. After she found father on the bedroom floor, not breathing and blue she "was on the phone. I had by daughter cause like I was freaking out. I had my daughter she was screaming in one * * * ear, I was on the phone with 911 on the other ear and my grandpa yelled for [S.O.] to come in and help him [with CPR]." Mother said S.O. was traumatized, but "at the same time he was like mom I just saved somebody's life. I'm like, I understand that but I mean you really shouldn't have to, you're only you know * * * (12) years old. * * * Or younger at the time." She did not

56.

believe that X.H. saw father, as X.H. was in the living room with her. Mother told the police that father used heroin in the past. After father was revived, he claimed he was just sleeping and had a sleeping disorder, which mother said was "[a] little bit of sleep apnea, not like a whole lot." Mother now believed that father overdosed.

{¶ 215} As to the January 23, 2023 incident, mother admitted father drank and went to the gas station with his cousin and wife. About 15 minutes after they got home, mother was told to call 911 because father was not breathing. She called 911 and accused father of overdosing, but she said "I know I shouldn't have accused him but I mean, I didn't know what else to do or think or say. And it just kind of like, I just reframed back to before."

{¶ 216} Mother claimed the people with father "actually are on medication. There were not on anything," and they did CPR on father, but "no Narcan was used that time. Nothing was." She believed father told the police that he had epilepsy. Mother honestly did not know if the January 2023 incident was an overdose.

*Housing*

{¶ 217} Mother moved out of T.V.'s home in early February 2023, and admitted that she took the appliances because: the washer was old and "could break down at any given time"; she helped to buy the dryer in 2010; the stove was bought in 2005, so it was an older appliance; and she paid for most of the refrigerator, which was scratched and dented and smashed on the one side.

57.

{¶ 218} Mother was asked why she did not correct father's testimony, given at the March 2023 hearing, that they still lived at T.V.'s home, and she replied, "I, I should have, I know. But it was more of like a pride thing. Like I'm here on behalf of my kids I don't want anything more used against me and being in a motel obviously wasn't a credential to have my, get my children back. Cause you know like I don't want to jeopardize more than what I have already lost. * * * I was kind of like in a stuck position." Mother and father were at the motel for about two months.

{¶ 219} The first week or two of April 2023, mother and father looked for a place to live, found the Vine trailer online and "[t]he guy was trying to give it away or for it to be moved and we talked him into just renting it. * * * Because it was too old to be moved." Mother and father were going to get the Vine trailer together, but they had a big argument, and he took off so she took it over. Mother produced a copy of the Vine trailer lease, effective May 1, 2023, which she signed the previous week although the lease was dated April 7, 2023, "when we had started working on it and I had started you know putting more and more into getting it fixed up." Mother did not put any money into the Vine trailer as the landlord paid for everything.

{¶ 220} Concerning the Vine trailer, prior to May 1, 2023, mother claimed she paid a $500 deposit and $500 rent "[b]y saving and doing these odd, odd jobs for people." She acknowledged she only received $400 in SSDI.

58.

{¶ 221} Mother was asked about a police report that stated on April 12, 2023, father was at the Vine trailer. She claimed she was in Bryan, Ohio at that time and had no idea that the police were there. She later stated that she called the sheriff, upon advice of counsel, and the police "trespassed" father. She said father did not have a key, but "[t]he back door doesn't really lock so all you have to do * * * is just turn it, but I fully intend on getting that fixed. By getting a new door. Like this week." Mother claimed that she did not know father was at the Vine trailer because "we had no heat there at the time. I was hardly there." Mother did not agree with Tom's testimony that as of last weekend, she and father lived together at the Vine trailer, nor did she agree that she and father went to the Custer home together, until about a month ago.

{¶ 222} Mother was asked about stable housing and replied, "It does seem like you know, I, I was bouncing around you know for a little bit. But one thing that even before this started, my kids had stability. I had my own place before any of this case even started. And then I moved in with my grandpa briefly and then I moved to Freemont, Ohio where I had my own place. I moved back because my grandpa got lonely. * * * When I got this place in Bryan [the trailer], yea, it took a lot of money * * * to fix it up. But at the end of the day I still had a home to go to which was my grandpa's. The kids had a home to go to. A safe, proper, suitable home. When he passed away you know it interrupted a lot of things in life * * * [a]nd I freaked out. I was staying * * * at a motel, * * * [in] the car sometimes you know friends, but you know as of right now I

59.

have a home. I don't intend on losing that home." Mother recognized that the caseworker and GAL did not visit the Vine trailer, because they were unaware where she lived, as she "had just got the place. I wanted to make sure it was up to their * * * standards before I contacted anyone."

### Juvenile Court's Finding – Mother's Motion

{¶ 223} At the end of the second day of trial, the court denied mother's motion to return custody of the children to her.

### GAL Filing - June 2, 2023

{¶ 224} Closing Argument/Proposed Findings of Fact/Conclusions of Law were filed by GAL Cook.

### Permanent Custody Trial - Day 3, June 5, 2023

{¶ 225} Witnesses were called to testify regarding X.H.

### Permanent Custody Trial - Day 4, June 30, 2023

{¶ 226} No witnesses were called to testify. The court addressed the issues regarding the procedural timetable and the GAL's lack of adherence to Sup.R. 48, with respect to X.H. The court found X.H.'s father's opportunity to be included in the case plan was insufficient, thus the court denied the permanent custody motion as to X.H. only and dismissed X.H.'s case.

60.

## Permanent Custody Law

{¶ 227} A juvenile court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Thus, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 228} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, two statutory prongs: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d); and (2) the child's best interest is served by granting permanent custody to the agency. *In re A.H.* at ¶ 12; R.C. 2151.353(A)(4). Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a

61.

firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 229} As to the first prong, R.C. 2151.414(B)(1)(a) provides that "the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent." When making a finding under R.C. 2151.414(B)(1)(a), the court must find, by clear and convincing evidence, that only one of the factors enumerated in R.C. 2151.414(E) exists. *In re A.H.* at ¶ 15. Here, the court found R.C. 2151.414(E)(1), (2), (3), (4) and (11) applied, and those factors are:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

62.

(2) Chronic * * * chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section * * *;

(3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section * * * or under an existing or former law of * * * any other state * * * that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination,

the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 230} As to the second prong, the best interest of the child, when making this determination, R.C. 2151.414(D)(1) provides that the court "shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 231} Here, the court found R.C. 2151.414(E)(11) applied.

## Juvenile Court's Judgment

{¶ 232} On July 12, 2023, the juvenile court issued its judgment entry, in which it granted permanent custody of the children to the agency. The court's overall findings and conclusions are summarized below.

{¶ 233} The court detailed the history of the cases, including: father's alleged overdose in the presence of mother's three oldest children, followed by two more alleged overdoses; B.M.'s premature birth, mother's positive drug test and her denial of drug use; the initial concerns with mother, including illegal drug use, lack of stable housing, mental health issues, an unhealthy and detrimental relationship with father, which issues were not satisfactorily resolved, despite numerous services offered to her; father's failure to make substantial progress on any of his case plan goals and his continued use of illegal drugs; the parents' drug use; the parents' lack of credibility with the agency and the court, about their relationship, drug use, housing and more, all to the detriment of the safety and well-being of the children, who were young and unable to protect themselves.

{¶ 234} The court found, by clear and convincing evidence, that the GAL, who was appointed at the inception of the cases, testified that the children were of young age and were bonded with their parents and their foster family, and it was in the best interests of the children that the motion for permanent custody be granted and mother and father's parental rights be terminated. The court found the GAL did not comply, in total, with Sup.R. 48, as reports were not timely filed and certain responsibilities were not fulfilled.

65.

The court found that while no party objected to or complained about the GAL, it was the court's responsibility to oversee the GAL. The court found that from the time the complaints were filed through trial, it had regular and frequent contact with mother and father, at the hearings where testimony related to the parents and the children, was received, and due to mother's involvement with FIC. The court found that due to its frequent contacts with the parents, significant weight was not given to the GAL's recommendations, thus any deficiencies in the GAL's performance were harmless. The court found the evidence on which it relied was significant enough to stand alone.

**First Statutory Prong**

{¶ 235} The court found, in accordance with R.C. 2151.414(B)(1)(a), the children cannot or should not be placed with the parents. The court found R.C. 2151.414(E)(1), (2), (3), (4) and (11) applied, and further found, by clear and convincing evidence, that (1) the children were placed outside of the home, and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy their problems which caused the children's removal from the home, each parent failed continuously and repeatedly to substantially remedy the conditions which caused the children to be placed outside of the home; (2) father's chemical dependency was so severe that he was unable to provide an adequate permanent home for the children at the present time, and it was not anticipated that he could remedy that within one year after the court's hearing; (3) the parents allowed the children to suffer abuse and neglect, from the date that the complaints

66.

were filed through trial; and (4) each parent demonstrated a lack of commitment to the children by showing an unwillingness to provide an adequate permanent home for the children. The court also found father's parental rights were involuntarily terminated to two half-siblings of the children, and he failed to provide clear and convincing evidence to prove that, notwithstanding the prior terminations, he could provide a legally secure permanent placement and adequate care for the health, welfare and safety of the children.

**Second Statutory Prong**

{¶ 236} The court made the following findings, in accordance with R.C. 2151.414(D)(1), that: permanent custody was in the best interest of the children, and in determining the best interest of each child, the court considered all credible evidence related to: (1) the interaction and interrelationship of the children with the parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the children; (2) the custodial history of the children, including whether the children were in the agency's temporary custody for 12 or more months in a consecutive 22-month period; (3) the children's need for a legally secure permanent placement, and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (4) whether any of the factors in R.C. 2151.414(E)(7) to (11) applied; the court found (E)(11) applied, as father had his parental rights involuntarily terminated to two half-siblings of the children.

67.

**{¶ 237}** The court further found that the children were placed with a foster family since their removal in December 2021, and the foster family wished to adopt the children. The evidence showed that the children were doing well in their foster home, and were stable, safe and meeting their developmental milestones. The children were bonded with the parents and foster family, and the children had regular visits with the parents and X.H. The foster mom testified she and her husband intended to have the children continue their relationship with X.H., and maintain regular contact.

**{¶ 238}** The court found, in considering all of the best interests factors, there was clear and convincing evidence presented that the children cannot and should not be placed with either parent, and it was in the best interest of each child that permanent custody be granted to the agency.

**{¶ 239}** The court ordered mother and father's parental rights, privileges and responsibilities to the children were terminated. The court further ordered that permanent custody of the children was granted to the agency.

**{¶ 240}** Mother and father appealed.

### Mother's First Assignment of Error

**{¶ 241}** Mother argues the juvenile court abused its discretion when it denied the joint motion to dismiss. She sets forth two issues:

68.

**Issue One:** The trial court erred when it decided that mother failed to substantially mitigate or rectify the circumstances which caused the children's removal.

**Issue Two**: The motion for permanent custody was filed outside the two-year time limit of R.C. 2151.353(G).

### Father's Assignment of Error

{¶ 242} Father argues the juvenile court erred when it granted the motion for permanent custody because the original complaint had been filed more than two years prior.

### R.C. 2151.353

{¶ 243} R.C. 2151.353(G) states:

Any temporary custody order * * * shall terminate one year after the earlier of the date on which the complaint in the case was filed or the child was first placed into shelter care, except that, upon the filing of a motion pursuant to section 2151.415 of the Revised Code, the temporary custody order shall continue and not terminate until the court issues a dispositional order under that section. In resolving the motion, the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier * * *.

69.

**Judgment Entry - Joint Motion to Dismiss - April 20, 2023**

{¶ 244} The juvenile court denied the parents' motion to dismiss the motion permanent custody filed by the agency. The court's findings are summarized below.

{¶ 245} The court found that mother and father have a significant drug history, as evidenced throughout the pendency of the cases where they struggled with substance abuse and had positive drug screens. The court found "[t]he parties have been less than honest with the Court and with the Agency," and their "credibility was compromised through statements that they made in their testimony concerning their use of illegal substances, their relationship with each other and whether they resided together, and for extensive periods of time one or both evaded the Agency." The court stressed "[t]he compromise of their credibility is taken as a significant factor in this Decision."

{¶ 246} The court cited R.C. 2151.353(G), and observed the parents argued the agency's motion for permanent custody was filed outside of the time frame prescribed by statute, and should be dismissed and the children returned to the parents. The court declined to address the issue, as it was not "central to this Motion due to Ohio case law." The court referred to *In re Young Children*, 76 Ohio St.3d 632, 638, 669 N.E.2d 1140 (1996), and noted parents' counsel "all agree[d] and acknowledge[d]" the case which held that "although the Agency filed its Motion for Permanent Custody outside the statutory guidelines, the Court can make dispositional orders relating to the children if the

70.

original problems that were present at the time of the filing of the complaints have not been resolved or sufficiently mitigated."

{¶ 247} The court found "[d]uring the pendency of this case, both [parents] were held in contempt for failing to comply with the Court's Order adopting the case plan. The basis of both parents' contempt was that they failed to follow the treatment recommendations of their individual providers."

{¶ 248} The court concluded the original facts which led to the filing of the complaints were not mitigated, because mother continued her relationship with father and lived with him. As such, the court viewed the parents as a couple and their actions impacted on each other. The court found it retained jurisdiction, and denied the parents' motion.

### Mother and Father's Arguments

{¶ 249} We will first address portions of Issue One and all of Issue Two, along with father's assignment of error, as similar arguments are presented.

*Issue One's Relevant Arguments and Issue Two*

{¶ 250} Mother offers a timeline of the children's cases: July 13, 2020, complaints filed; December 30, 2021, the children removed; January 31, 2022, mother consented to agency's temporary custody; December 30, 2022, agency filed motion to return the children to mother, within R.C. 2151.414(A) time period; and January 31, 2023, agency filed for permanent custody, outside of R.C. 2151.414(A) time period.

71.

{¶ 251} Mother argues the agency's motion for permanent custody was filed outside of the two-year time limit in R.C. 2151.353(G). She contends temporary custody was granted on January 31, 2022, but the agency filed no motions until December 30, 2022, when the agency filed to return the children or extend temporary custody. Mother asserts this is outside of the two-year deadline from the date the complaints were filed in July 2020, thus the juvenile court erred when it denied mother's motion to dismiss.

{¶ 252} Mother submits that no matter when the clock started ticking, with the filing of the complaints or when the agency was granted temporary custody, the agency did not file for permanent custody within the one year "sunset date," in R.C. 2151.353(G). She also claims the agency did not file its motion for permanent custody one month prior to the termination of the temporary custody order, pursuant to R.C. 2141.415(A).

{¶ 253} Father argues the two-year deadline in R.C. 2151.415(D)(4) is steadfast and has been applied by courts as a definite deadline. He cites to *In re L.B.*, 8th Dist. Cuyahoga No. 112407, 2023-Ohio-2392. Father contends he filed a motion to dismiss the cases because the complaints were filed more than two years prior, on July 13, 2020, and the motion for permanent custody was filed January 30, 2023. He claims "[i]t is common knowledge that two years equals 730 days, and here, 931 days had passed. Father submits the agency allowed more 200 days to elapse before filing, which is too late.

72.

## Standard of Review

{¶ 254} An abuse of discretion indicates the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

## Law and Analysis

{¶ 255} The parents argue the juvenile court erred when it did not grant the joint motion to dismiss, based on the untimely motion for permanent custody filed by the agency.

{¶ 256} In reaching its judgment entry denying the joint motion to dismiss, the juvenile court relied on *In re Young*, 76 Ohio St.3d 632, 669 N.E.2d 1140. In that case, the Supreme Court of Ohio held "the passing of the sunset date pursuant to R.C. 2151.353(F)[5] does not divest juvenile courts of jurisdiction to enter dispositional orders." *Id.* at 637. The court further found:

> The obligation to file a motion [for permanent custody] thirty days
>
> prior to the sunset date is not vitiated and the failure to file is not harmless
>
> error. * * * Accordingly, although the court has continuing jurisdiction,

---

[5] The version of R.C. 2151.353(F) in effect at that time, provided: Any temporary custody order * * * shall terminate one year after the earlier of the date on which the complaint in the case was filed or the child was first placed into shelter care, except that, upon the filing of a motion pursuant to section 2151.415 of the Revised Code, the temporary custody order shall continue and not terminate until the court issues a dispositional order under that section.

73.

temporary custody terminates when the sunset date passes without a filing pursuant to R.C. 2151.415(A). However, because the court retains jurisdiction over the child, it may make further dispositional orders as it deems necessary to protect the child. * * *

This holding allows the juvenile court to assess each situation on its merits and does not mandate the return of children to a situation from which they originally needed protection solely because the agency charged with their care missed a filing deadline. Thus, we hold that when the sunset date has passed without a filing pursuant to R.C. 2151.415 and the problems that led to the original grant of temporary custody have not been resolved or sufficiently mitigated, courts have the discretion to make a dispositional order in the best interests of the child. Where the original problems have been resolved or sufficiently mitigated, courts may not make further dispositional orders based on the original complaint. *Id.* at 638.

{¶ 257} We find, in accordance with the *In re Young* decision, the juvenile court had the authority to exercise its discretion, after the sunset date, to make a dispositional order in the best interests of the children upon finding that the parents had not remedied the problems which led to the initial grant of temporary custody.

**{¶ 258}** We now turn to the remaining arguments in mother's Issue One, that the juvenile court erred when it found she had not resolved or sufficiently mitigated her original problems.

*Issue One's Remaining Arguments*

**{¶ 259}** Mother argues the evidence shows that she sufficiently mitigated her problems, as the agency was ready to return the children to her in December 2021, prior to the grant of temporary custody. However, because she tested positive for meth on December 8 and 10, 2021, an emergency custody hearing was held on December 30, 2021, "[y]et [the agency] still considered her 'compliant' with all [of] the rest of the case plan, and noted that the previous <u>eight</u> random drug screens were negative." (Emphasis sic.) Shortly thereafter, the court granted temporary custody of the children to the agency.

**{¶ 260}** Mother asserts "[t]he parties kept arguing that the 'sufficiently mitigated' test was to look at the conditions alleged in the original complaint[s]," which "allowed the court to examine whether [father] had sufficiently mitigated because allegations were made regarding his drug use in [the] complaint[s]." But mother claims "as happened in * * * *In re Young* * * * a new complaint for temporary custody was filed in December 2021, which as in *In re Young*, 'established its own sunset date because it was based on facts learned subsequent to the filing of the original complaint.' *Id.* at 638-639."

75.

{¶ 261} Mother contends the juvenile court "must have examined the conditions which led to [the agency's] filing for temporary custody," and "[w]hen temporary custody was granted, [father] was no longer on a case plan * * * [so] his conditions should not have been examined under the [sufficiently mitigated] *Young* test." She insists the juvenile court should have only considered her two positive meth screens, her subsequent eight negative screens and her successful completion of inpatient treatment for the second time. She claims, taking the case history as a whole, she showed she "was successfully in recovery and was committed to being sober and continuing supportive treatment."

**Analysis**

{¶ 262} Upon review, we find that, pursuant to *In re Young*, the juvenile court properly exercised its discretion by making a dispositional order in the children's best interests, when the evidence in the record clearly supported its ruling that mother and father's original problems which led to the initial grant of temporary custody, had not been resolved or sufficiently mitigated after the sunset date had passed.

{¶ 263} Mother's problems at the time that temporary custody of the children was granted to the agency included: struggling with illegal drug use, she tested positive for meth twice the month prior; continuing to be involved with father, a known drug user; and not being truthful or cooperative, as she repeatedly denied using drugs and denied

76.

being in a relationship with father. At the time the sunset date passed, mother had not resolved or sufficiently mitigated her problem with drugs, lying and father.

{¶ 264} Father's problems at the time that temporary custody of the children was granted to the agency included repeated use of illegal drugs, positive drug screens and not being truthful or cooperative with the agency or court. At the time that the sunset date passed, father had not resolved or sufficiently mitigated his problem with drugs and lying.

{¶ 265} We find no abuse of discretion by the juvenile court. Accordingly, we find mother's first assignment of error not well-taken and father's sole assignment not well-taken.

## Mother's Second Assignment of Error

**Mother's Arguments**

{¶ 266} Mother argues the juvenile court erred by not dismissing the children's cases based on the GAL's failures. She notes the court, in its final judgment entry, stated it did not place significant weight on the GAL's report, and that any deficiencies in the GAL's performance were harmless. Mother asserts the GAL's report concerned X.H., not the children, thus she "was severely prejudiced by being unaware of the GAL's recommendations and reasons for [the children] before the hearing." She further argues the GAL's testimony in lieu of a report was minimal and, as the trial court found, done in near-complete failure to observe the requirements of the GAL report and [Sup.R.] 48.

77.

**{¶ 267}** Mother contends "[t]he GAL's complete failure to file a report on [the] children, or adequately investigate the children and [mother], should have warranted dismissal of the matter as to [the children]. She claims "[i]f the errors were fatal to the case as to X.H., then the errors should be found even more fatal here."

**{¶ 268}** Mother submits that "[p]ermitting or not striking the GAL's testimony regarding [the] two children constitutes plain error." She maintains "the GAL's oral report, which he stated was in lieu of a written report, was deficient and non-compliant with Sup.R. 48 and the Williams County local rules. This is not harmless error as the trial court found."

**{¶ 269}** In support, she cites to *In re A.S.*, 10th Dist. Franklin Nos. 21AP-249, 21AP-259, 2022-Ohio-1861, where the parent, at the permanent custody trial, failed to object to the admission of the GAL's testimony and report, thus the plain error standard of review applied when considering whether the juvenile court erred by failing to remove the GAL and by admitting the GAL's testimony. *Id.* at ¶ 54. Mother requests the juvenile court's judgment be reversed, based on plain error.

**State's Arguments**

**{¶ 270}** The state argues the children's cases are similar to *In re T.C.*, 6th Dist. Lucas No. L-15-1106, 2015-Ohio-3665, ¶ 21-22, which was recently cited in *Short v. Rhodes*, 2021-Ohio-1845, 173 N.E.3d 806 (6th Dist.) and *In re A.D.*, 2023-Ohio-2442, 221 N.E.3d 259 (3d Dist.).

78.

**Law**

**Plain Error**

{¶ 271} "[T]he plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus. Further, "[i]n applying the doctrine of plain error in a civil case, reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice." *Id.* at 121. *See also In re A.S.* at ¶ 54.

{¶ 272} "Because parental rights determinations are difficult to make and appellate courts accord wide latitude to the trial court's consideration of evidence in these cases, '[p]lain error is particularly difficult to establish.'" (Citations omitted.) *Hamilton v. Hamilton*, 10th Dist. Franklin No. 14AP-1061, 2016-Ohio-5900, ¶ 8. *See also In re A.S.* at ¶ 54.

**In re A.S., 10th Dist. Franklin Nos. 21AP-249, 21AP-259, 2022-Ohio-1861**

{¶ 273} The court noted "[t]he Rules of Superintendence provide a non[-]exhaustive list of duties that GALs are required to perform," then detailed the Sup.R. 48 obligations that the GAL did not perform. *Id.* at ¶ 52, 57-71. The court found, that

79.

"under the facts and circumstances present in this case, * * * the juvenile court committed plain error under R.C. 2151.281(D) in not requiring the GAL to faithfully discharge his duties and in not discharging the GAL and appointing a new GAL for failure to faithfully discharge GAL duties, as well as in admitting the GAL's report and testimony." *Id.* at ¶ 75.

**In re T.C., 6th Dist. Lucas No. L-15-1106, 2015-Ohio-3665**

{¶ 274} This court set forth that "[a]ppellate courts will not reverse trial court decisions to admit a [GAL]'s testimony and recommendation unless the trial court abused its discretion." *Id.* at ¶ 20. This court noted "[t]he purpose of appointing a [GAL] in a parental rights allocation proceeding is 'to provide the court with relevant information and an informed recommendation regarding the child's best interest.' Sup.R. 48(D). Rules of superintendence are not, however, 'the equivalent of rules of procedure and have no force equivalent to a statute.' * * * They are 'internal housekeeping rules which are of concern to the judges of the several courts but create no rights in individual[s].'" (Citation omitted.) *Id.* at ¶ 21.

{¶ 275} "This court has interpreted Sup.R. 48(D) as a general guideline for the conduct of courts. *See In re E.S.*, 6th Dist. Ottawa No. OT-14-008, 2014-Ohio-3067, ¶ 64 (concluding that the trial court did not abuse its discretion by admitting the [GAL]'s testimony and report even though appellant complained that the guardian failed to comply with Sup.R. 48(D))." *Id.* at ¶ 22. "Further, the trial court, as trier of fact, is

80.

permitted to assign weight to the [GAL]'s testimony and recommendation and to consider it in the context of all the evidence before the court." *Id.* at ¶ 23.

## Analysis

{¶ 276} A review of the record shows the juvenile court understood the GAL's short-comings, observed the GAL did not comply with all of the requirements of Sup.R. 48, with respect to the timely filing of reports and performing certain duties, and appreciated it was the court's responsibility to oversee the GAL.

{¶ 277} The court described its active involvement in the cases from the time the complaints were filed until trial, noting it had regular and frequent contact with the parents at the multiple hearings, where testimony related to the parents and the children was received. The court had additional contact with mother when she was a participant in FIC. The court recognized that due to its repeated contacts with the parents, it did not give significant weight to the GAL's recommendations, as the evidence on which it relied was significant enough to stand alone.

{¶ 278} The record further reveals that during the time that the children's cases were pending, GAL Cook filed seven reports and after the first day of trial, he filed Closing Argument/Proposed Findings of Fact/Conclusions of Law. The record also shows that throughout the cases, five agency employees worked on the cases at various times. The employees reported their dealings with the children and parents to the court, and some of the employees also shared their opinions and beliefs concerning the

81.

children's best interest. In addition, the children's foster mom provided the court with information concerning the children, their well-being and their visits with the parents, and she shared what she thought was in the children's best interests.

{¶ 279} Given the applicable law, and the state of the record including the ample evidence regarding the children's best interests, exclusive of the GAL's trial testimony, we find the juvenile court did not commit plain error by not dismissing the children's cases based on the GAL's failures. Moreover, we find the dismissal of X.H.'s case does not in any way affect the children's cases or warrant the dismissal of the children's cases, as X.H.'s case was dismissed because the juvenile found that X.H.'s father's opportunity to be included in the case plan for X.H. was insufficient.

{¶ 280} Accordingly, mother's second assignment of error is not well-taken.

### Third Assignment of Error

{¶ 281} Mother argues "[t]he trial court's decision to grant permanent custody and finding that it was in the children's best interests was not supported by clear and convincing evidence." She contends she substantially remedied the conditions which caused the children to be placed outside of the home, but emergency custody was granted based on her two out of ten positive drug screens in one month. She claims she "had been sober for almost one year and had completed the case plan at the time of trial," and but for being with father, the children would have been returned to her.

82.

{¶ 282} Mother asserts "she did not allow the children to suffer abuse and neglect since the filing of the complaint and motion for permanent custody, as "the caseworkers testified that [mother] was bonded to the children and visitations were going very well." Yet, "the trial court found that her 'continued use of illegal drugs' and the two inpatient treatment stints constituted neglect." (Emphasis sic.) This is irrational and unreasonable, she argues, since the court ordered her to "perform both inpatient treatments; to have the trial court's orders warrant a finding of neglect is an abuse of discretion."

{¶ 283} Mother maintains that she showed commitment and a willingness to provide a permanent home, and at the time of trial, "she had obtained new housing and submitted evidence that the home was appropriate and safe." She claims she was no longer with father "and the court should have found that she was no longer living with him * * * [and her] parental rights should not hinge upon whether [he] could follow a case plan."

{¶ 284} Mother argues as to "the children's best interests: the GAL's deficiencies and total lack of a report render the GAL's opinion on this point useless; however, the GAL did testify that 'absolutely' there was a detriment to the children in severing their bond with [mother]." Mother "requests this Court review the statutory best interest factors and find that permanent custody is not in the children's interest, as their mother had made a permanent and appropriate home and had rectified the conditions that led to removal."

83.

**Analysis**

{¶ 285} On July 12, 2023, the juvenile court filed a 17-page judgment entry in which it granted permanent custody of the children to the agency, and terminated mother and father's parental rights to the children. In so ruling, the court summarized the extensive evidence presented, cited to and relied upon the applicable law, indicated which factors it considered and offered well-reasoned explanations for the decision it rendered.

**First Prong Findings for Permanent Custody Award**

{¶ 286} We have carefully reviewed the record, which we conclude contains clear and convincing evidence to support the juvenile court's finding that the children cannot and should not be placed with either mother or father, as both parents repeatedly and continuously failed to remedy the conditions which caused the children's removal from the home, despite reasonable case planning, a multitude of case plan services and diligent efforts by the agency offered to assist the parents to remedy their problems.

{¶ 287} Throughout the agency's involvement with the family, the main concerns were the parents' drug use, relationship and housing. Both parents used illegal drugs, which was confirmed by countless positive drug screens, yet both denied drug use for the majority of the cases. The court ordered mother and father to partake in drug treatment programs, yet drug use continued; father used regularly, mother used more sporadically. The parents' relationship was concerning, largely due to their drug use. By the parents' accounts, their relationship was on and off, however, since the parents were often not

84.

honest with the court or the agency, which was revealed in their jail communications and inconsistent statements and testimony, the status of their relationship was not always known. Housing was a concern as it was rarely stable and appropriate, because mother and the children frequently moved between the trailer and T.V.'s home and father moved, sometimes with the children, from trailers, to relatives, to Kentucky and to T.V.'s home. It was never really known when the parents lived together, as they were not always honest and forthcoming with the agency.

{¶ 288} We further conclude that clear and convincing evidence in the record supports the juvenile court's findings that both parents exhibited a lack of commitment to the children due to their unwillingness to provide an adequate, permanent home for the children, due to father repeatedly failing and/or refusing to engage in substance abuse treatment and other case plan requirements, and due to mother repeatedly choosing her relationship with father over the needs and safety of the children. Mother was constantly advised that the court viewed the parents as a couple and their actions impacted on each other, and that reunification could only occur if she ended her relationship with father. Time and again mother said she understood, but chose father and prioritized him over the children.

{¶ 289} Although mother successfully completed many of her case plan services, she failed to change her behaviors; she still used illegal drugs on occasion and continued her relationship with father. She also defied court orders, was found in contempt of court

and was jailed. Same with father. Thus, the original conditions which led to the filing of the complaints, continued to the detriment of the children.

**Second Prong Findings for Permanent Custody Award**

{¶ 290} We have thoroughly reviewed the record, and we conclude it contains clear and convincing evidence to support the juvenile court's finding that it was in the children's best interests for permanent custody to be awarded to the agency.

{¶ 291} The record shows the juvenile court considered the interaction and relationships of the children with mother, father, caregivers and relatives, the children's custodial history and the children's need for a legally secure permanent placement.

{¶ 292} The record further reveals that since the children were removed from the home in December 2021, they have been with the same foster family and were stable, safe and doing well. The children, who were bonded with the parents and foster family, had regular visits with the parents and X.H., which were supervised by the foster mom. The foster parents wished to adopt the children, and intended to continue the children's relationship with X.H.

{¶ 293} Based on the foregoing and the abundance of evidence in the record, including the agency's numerous reports and the GAL reports, we find mother's third assignment of error not-well taken.

86.

**{¶ 294}** On consideration whereof, the judgment of the Williams County Court of Common Pleas, Juvenile Division, is affirmed. Appellants, A.H. and K.M. are ordered to split the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Myron C. Duhart, J.                      _____
                                                            JUDGE

Charles E. Sulek, P.J.
CONCUR.                               _____
                                                            JUDGE

Gene A. Zmuda, J.                     _____
CONCURS IN JUDGMENT                   JUDGE
ONLY.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.